**In re CONTINENTAL AIRLINES CORPORATION, et al., Debtors.**

**The NATIONAL MEDIATION BOARD, Walter C. Wallace, Chairman, Robert A. Harris, Member, and Helen Witt, Member, Appellants,**

v.

**CONTINENTAL AIRLINES CORPORATION, et al., Appellees.**

**No. H–84–1747.**
**Bankruptcy No. 83–04019–H2–5.**
**Adv. No. 83–2493–H3.**

United States District Court,
S.D. Texas,
Houston Division.

May 31, 1985.

Lenard Parkins, Sheinfeld, Maley & Kay, Houston, Tex., Richard L. Wyatt, Jr., Fish-

er & Phillips, Atlanta, Ga., John J. Gallagher, Jr., Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Weil, Gotshal & Manges, New York City, N.Y., for Continental Airlines, debtor, appellee.

Allen L. Lear, Dept. of Justice, Washington, D.C., Letitia Z. Taitte, Asst. U.S. Atty., Houston, Tex., for National Mediation Board, appellant.

Wilma B. Liebman, Washington, D.C., for International Brotherhood of Teamsters.

## MEMORANDUM AND ORDER

SINGLETON, Chief Judge.

### I. INTRODUCTION

Here unfolds yet another chapter in the continuing Continental Airlines bankruptcy saga. This particular chapter involves three parties:

1) the plaintiffs—Continental Airlines Corporation, Continental Airlines Inc., Texas International Airlines, Inc., and TXIA Holding Corporation (collectively "Continental")—presently operating as a Debtor-In-Possession under the U.S. Bankruptcy Code, 11 U.S.C. §§ 1101(1), 1107, 1108,[1]

2) the defendants—the National Mediation Board and its members (the "NMB" or "Board")—an independent federal administrative-agency established to administer the Railway Labor Act and effectuate that Act's purposes;[2] and

3) the intervenor defendant—the Airline Division of the International Brotherhood of Teamsters (the "IBT" or "Teamsters")—a labor union seeking to represent certain groups of Continental's employees.

To understand how these entities' interrelationships developed to produce this particular lawsuit, one must first understand the basic statutory foundation for the NMB proceedings underlying this suit.

*A. Statutory Foundation of
NMB Proceedings*

Congress enacted the Railway Labor Act (RLA) expressly in order

(1) to avoid any interruption to commerce or to the operation of any carrier engaged therein;

(2) to forbid any limitation upon freedom of association among employees or any denial ... of the right of employees to join a labor organization;

(3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this [Act]; [and]

(4) to provide for the prompt and orderly settlement of all disputes concerning [employment conditions and employment contracts].

45 U.S.C. § 151a. To further those purposes, 45 U.S.C. § 152 Fourth grants to the majority of any "craft" or "class" of employees the right to determine who shall represent that craft or class in collective bargaining with the employer. *Brotherhood of Railway and Steamship Clerks v. Association for the Benefit of Non-Contract Employees*, 380 U.S. 650, 659, 85 S.Ct. 1192, 1197, 14 L.Ed.2d 133 (1965) (*"Railway Clerks"*).

Section 152 Ninth protects that employee right by giving the NMB "the power to resolve controversies concerning [that right] and as an incident thereto to determine what is the appropriate craft or class in which the election should be held." *Id.* More fully, that Section provides that

If any dispute shall arise among a carrier's employees as to who are the representatives of such employees ... it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty

---

**1.** *See In re Continental Airlines,* 40 B.R. 299, 300 n. 1 (Bankr.S.D.Tex.1984).

**2.** *E.g., International In-Flight Catering v. NMB,* 555 F.2d 712, 714 (9th Cir.1977).

days[3] ... the name or names of the individuals or organizations ... authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this [Act]. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election.... The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph.

45 U.S.C. § 152 Ninth (footnote inserted).

■ "Representation disputes" under § 152 Ninth include situations where a single union applies to be a certified employee representative or where questions arise as to the definition of the relevant crafts or classes. *IBT (Airline Division) v. Texas International Airlines*, 717 F.2d 157, 159 (5th Cir.1983) ("*TIA*"); *see also Summit Airlines v. Teamsters Local 295*, 628 F.2d 787, 795 n. 4 (2d Cir.1980). Since the IBT has applied for a certificate to represent certain Continental employees and Continental questions the proper crafts or classes to include in that certificate, this case involves a representation dispute within the meaning of § 152 Ninth.

■ Continental's not being a railroad does not render these provisions of the Railway Labor Act inapplicable. 45 U.S.C. § 182 (extending coverage to air carriers); *see also TIA*, 717 F.2d at 158 (RLA applies to Continental). Nor does Continental's bankruptcy excuse it from § 152, for the RLA specifically provides that

> The term "carrier" includes ... any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such "carrier".

45 U.S.C. § 151 First.

Having received the IBT's certification application, § 152 Ninth therefore imposes upon the NMB a duty to investigate this labor representation dispute. As the following factual background explains, Continental accuses the Board of violating that statutory duty.

*B. Factual Background of this Lawsuit*

It appears undisputed that the interrelationships among the Board, Teamsters, and Continental developed as follows:

In May 1980 the Board certified the Teamsters as the collective bargaining representative for the approximately 1800 office, clerical, fleet service, and passenger service employees of Texas International Airlines ("TIA"). TIA with its 3,000 employees and Continental Airlines with its 10,000 employees merged in October 1982. The resultant corporation, Continental, immediately refused to recognize the IBT as the collective bargaining representative for the combined TIA/Continental Airlines work force. The Fifth Circuit refused to enforce the former—TIA employees' collective bargaining agreement. *TIA*, 717 F.2d 157. The Teamsters accordingly filed with the Board the certification application at issue in this suit.

That application asked the Board to divide the larger Continental work force into

---

**3.** The 30-day language is directory rather than mandatory. *System Federation No. 40 v. Virginian Ry.*, 11 F.Supp. 621, 627 (E.D.Va.1935), aff'd 84 F.2d 641 (1936), aff'd 300 U.S. 515, 57 S.Ct.

592, 81 L.Ed. 789 (1930); *Air Florida v. NMB*, 534 F.Supp. 1, 11 (S.D.Fla.1982); *appeal dismissed* 720 F.2d 686 (1983).

three separate bargaining units: the office/clerical employees, the fleet service employees, and the passenger service employees. Continental objected that, inter alia, the passenger service and fleet service employees should be combined into one unit. After nine days of hearings, the Board issued a decision on 11 August 1983 adopting the IBT's three proposed crafts/classes for upcoming representation elections among Continental employees.

On 24 September 1983 Continental filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code. Approximately two-thirds of its 12,-000 employees were then furloughed or on strike; and it ceased flights to 55 of the 87 cities it had previously serviced. Based upon its bankrupt position and such post-bankruptcy changes, Continental asked the Board to stay the upcoming elections and reconsider the appropriate definition of employee bargaining units. The IBT, meanwhile, asked the Board to reword that election's proposed ballots—principally changing the ballot alternatives from an "IBT or no union" choice to a "unionization or no unionization" choice.

Denying the requests of both Continental and the IBT, the Board on 2 November 1983 ordered the elections to proceed as planned in the passenger service and fleet service bargaining units. The Board did not order elections among the clerical/office employees since it had found those employees insufficiently interested in unionization. The ballots went out in mid-November; and a November 16th NMB Order allowed Continental to file challenges to those ballots. The Board scheduled the ballot tallying for January 12th and 13th.

A Board representative ruled on the IBT's and Continental's ballot challenges on 3 January 1984. Continental appealed these rulings to the full Board on January 10th. On that same date the Board, responding to Continental's continued request to stay the elections, stated that the Board would not disrupt the planned election but rather would consider the relevance of Continental's post-bankruptcy condition when assessing the ballot returns and when deciding whether to certify the IBT on the basis of those returns.

Meanwhile in the Bankruptcy Court, Continental had filed this lawsuit on 16 November 1984. Accusing the Board of ignoring Continental's post-bankruptcy condition, this lawsuit alleges that the Board has done a statutorily insufficient investigation of the Continental's crafts and classes. Continental seeks a declaratory judgment adjudging the Board's investigation insufficient, and seeks to enjoin the NMB elections until (1) the Board sufficiently investigates Continental's post-bankruptcy condition, and (2) the Bankruptcy Court either approves Continental's reorganization plan or authorizes the elections to proceed. The Complaint bases its declaratory judgment prayer on 28 U.S.C. § 2202, and bases its injunction prayer on both 28 U.S.C. § 1651 and the stay provisions of the U.S. Bankruptcy Code, 11 U.S.C. §§ 105, 362(a).

That same November the Bankruptcy Court denied Continental's TRO request. In December it allowed the IBT to intervene. After a 20 December 1983 hearing, the Bankruptcy Court stayed the election pursuant to the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362(a)(1). That stay order, dated 5 January 1984, was filed January 11th. The opinion supporting that stay appears at 40 B.R. 299 (Bankr.S. D.Tex.1984).

*C. The Lawsuit's Present Status*

Presently pending in this suit are:

(1) the defendants' appeals concerning the stay;

(2) the defendants' motions to withdraw the reference of this suit;

(3) the defendants' motions to dismiss the Complaint; and

(4) the various motions relating to plaintiffs' discovery attempts.

This Court has carefully analyzed the complex legal arguments of all three parties in light of the law and facts relevant to these matters. For the reasons explained

below, this Court must reverse the Bankruptcy Court's stay order, withdraw the reference, and dismiss the discovery motions as well as the underlying Complaint.

## II. THE APPEAL

### A. The Appealed Decision

The Bankruptcy Court based its order upon the automatic stay provided by 11 U.S.C. § 362. *In Re Continental Airlines,* 40 B.R. 299, 301 (Bankr.S.D.Tex.1984). More specifically, it relied solely upon that portion of § 362(a)(1) which stays

the commencement of or continuation ... of a judicial, administrative or other *proceeding against the debtor* that was ... commenced before the commencement of the case under this title....

*Id.* at 303 (emphasis added).

The defendants had objected that a Board representation proceeding is not a proceeding "against" the carrier. The Bankruptcy Court first countered that Continental was an "involved party" since the NMB craft/class determination entailed substantial fact findings concerning Continental's operations and since Continental clearly participated in the NMB proceedings. Rejecting defendants' objection, the Court then concluded that

[t]o accept the argument that the positions of IBT and Continental are not one against the other would be a sham. Clearly, the two parties, IBT and Continental have adversary interests which bring the NMB proceedings within the purview of Sec. 362(a) of the Bankruptcy Code.

*Id.* at 306. The Court accordingly granted the automatic stay.[4] *Id.*

The primary issue in this appeal therefore focuses upon whether the stayed NMB

proceedings were "against" Continental within the meaning of § 362(a)(1).

### B. Applicability of the Automatic Stay

■ Section 362 has a very broad scope—automatically staying almost any type of action against the debtor or his property.[5] Yet Congress surely did not intend to automatically enjoin *all* actions conceivably characterizable as somehow being "against" the debtor. Although the stay's broad scope must therefore have some implicit limitations, neither the statute's general "against the debtor" language nor the sparse case law construing that language suggest what those limits are. This Court therefore assesses those limits by examining the phrase "proceeding against the debtor" from five perspectives: the nature of NMB proceedings, the mandates of the RLA, analogies to the historic limitations of bankruptcy jurisdiction, the twin purposes of § 362, and an old somewhat analogous NLRB case.

### 1. Nature of NMB proceedings

■ Section 152 Ninth representation proceedings select the *employees'* representative; not the carrier's. *Railway Clerks,* 380 U.S. at 667, 85 S.Ct. at 1201. The proceedings resolve disputes *between employees* as to who, if anyone, shall represent them in collective bargaining. *Pan American World Airways v. IBT,* 275 F.Supp. 986, 994 (S.D.N.Y.1967) *aff'd. upon district court's opinion* 404 F.2d 938 (1969). They do not deal with any disputes between the carrier and employees. *Id.* Therefore the only proper parties to NMB representation proceedings are employees and their potential bargaining representatives. *Railway Clerks,* 380 U.S. at 667, 85 S.Ct. at 1201.

---

**4.** The defendants also cited § 362(b)(4), which exempts from the automatic stay any "proceeding by a government unit to enforce such governmental unit's police or regulatory power...." They had therefore argued that Subsection (b)(4) exempted the Board proceeding from the stay. Concluding that the Board exercised no police or regulatory authority through its

proceedings, the court rejected that second argument as well. *In re Continental,* 40 B.R. at 304–05.

**5.** *E.g., In re Pagitt,* 3 B.R. 588, 589 (Bankr.W.D. La.1980); 2 *Collier on Bankruptcy* ¶ 362.04 at 362–27, 28 (15th Ed.1985) (*"Collier"*).

 Carriers accordingly have no "side" in these pre-certification proceedings, and cannot even invoke the Board's services. *Summit Airlines*, 628 F.2d at 793; *Lamoille v. R. Co. v. NMB*, 539 F.Supp. 237, 247 (D.Vt.1982). Carriers have no vote in certification elections. Indeed, the RLA forbids their in any way interfering with or influencing the employees' organizational efforts and choice of a bargaining representative. 45 U.S.C. §§ 151a(2) & (3), 152 Third, 152 Fourth, 152 Ninth. The RLA accordingly leaves solely to the Board's discretion the extent, *if any*, to which a carrier can express views on craft/class questions. *Railway Clerks*, 380 U.S. at 667, 85 S.Ct. at 1201 (emphasis added). Thus lacking a legitimate interest in pre-certification proceedings, carriers are not proper parties to NMB craft/class investigations. *Id.; Trans World Airlines v. NMB*, 107 LRRM 2571, 2577 (D.D.C. 1981) ("*TWA*").

 Continental obviously would prefer a different craft/class definition delineate the electorate in this NMB election. Coupled with its opposition to the Teamsters representing its employees, Continental does have an interest "adversary" to the IBT. But given Continental's lack of any legitimate interest in this representation proceeding, it would unduly strain the reach of the automatic stay to characterize this proceeding as being "against" Continental for § 362(a)(1) purposes. This Court therefore concludes that this NMB proceeding falls outside the implicit limits circumscribing the automatic stay's scope.

### 2. RLA mandates

Many provisions of the RLA make clear Congress's intent to guarantee employees the right to organize and chose a collective bargaining representative free from any carrier interference or influence. 45 U.S.C. §§ 151a(2) & (3), 152 Third, 152 Fourth, 152 Ninth; *see also Lamoille*, 539 F.Supp. at

247. That guarantee of employees' organizational freedom from any carrier interference is therefore a very salient feature of the RLA. *Pan American*, 275 F.Supp. at 998.

 Congress's specifically defining "carrier" to include any "receiver, trustee, or ... other [entity] in the possession of the business of any ... carrier" demonstrates its intent to prevent even Debtor-In-Possession carriers such as Continental from interfering with employees' right to representation. Thus Continental's invocation of shelter under the Bankruptcy Code should neither relieve it of its obligation of non-interference nor rob its employees of their representational rights.[5a]

Such clear RLA mandates strongly suggest that when Congress enacted the automatic stay in 1978, it did not intend the phrase "proceedings against the debtor" in § 362(a)(1) to include these NMB representation proceedings.

### 3. Analogy to historic limitations on bankruptcy jurisdiction

Bankruptcy courts have historically had jurisdiction to enjoin actions "against the debtor's property".[6] Case law limiting the scope of that jurisdiction supports by analogy this Court's conclusion that NMB representation proceedings are not actions "against the debtor" within § 362(a)(1). Since they rest upon old Bankruptcy Codes and Rules, those cases cannot control this Court's construction of the more recent § 362. But since the automatic stay is based upon the prior statutes, rules, and case law, the following cases provide this Court some helpful guidance. *See 2 Collier* ¶ 362.01 at 362–6.1.

In *Callaway v. Benton*, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949), for example, the Supreme Court recognized the old Bankruptcy Code's delegation to the bank-

---

**5a.** *Cf. NLRB v. Bildisco & Bildisco, Debtors-In-Possession*, 465 U.S. 513, — & n. 8, ——–——, ——, 104 S.Ct. 1188, 1195 & n. 8, 1196–97, 1201, 79 L.Ed.2d 482, 493 & n. 8, 495–96, 501 (1984);

*Shopmen's Local No. 455 v. Kevin Steel Products*, 519 F.2d 698, 706 (2d Cir.1975).

**6.** For the history of that jurisdiction, *see generally 2 Collier* ¶ 362.01.

ruptcy courts of exclusive control over the administration of debtors' estates. *Id.* at 142, 69 S.Ct. at 441. Yet the Court went on to conclude that "there can be no question ... that Congress did not give the bankruptcy courts exclusive jurisdiction over all controversies that in some way affect the debtor's estate". *Id.* (footnote omitted). As another example, *In re Dolly Madison Industries,* 504 F.2d 499 (3rd Cir. 1974), concerned Virginia's revocation of the debtor's certificate of authority to do business. Noting that that revocation prevented him from operating his plant, the debtor argued that Virginia's action constituted an interference with his property lying within a bankruptcy court's summary jurisdiction to enjoin. Rejecting the existence of such authority, the Third Circuit stated that

> [Virginia] has made no claim against the "property" of the debtor corporation. The mere fact that the debtor's property may be affected by state law does not constitute a "claim" against that property, and absent such a "claim" summary jurisdiction is unavailable.

*Id.* at 503–04.

The Fifth Circuit quite recently faced a bankruptcy court's exercise under the old Bankruptcy Code of jurisdiction over a stock ownership controversy among shareholders. That controversy had allegedly affected adversely the administration of the debtor's Chapter 11 plan. *In re Paso del Norte Oil,* 755 F.2d 421, 422–25 (5th Cir.1985). After noting that the shareholder controversy did not entail a technical "claim" against the corporate debtor or its property, the court stated that neither a "chilling effect" upon the Chapter 11 plan nor a potential impact upon other claims

against the estate would justify bankruptcy jurisdiction if it was " 'possible' to administer the estate without resolving the controversy." *Id.* at 425. Concluding that that "possibility" existed, the Fifth Circuit held the bankruptcy court's exercise of jurisdiction improper. *Id.* at 425–426.[7]

These cases illustrate that historically courts have not considered an action to be "against" the debtor's estate simply because the debtor has a strong interest in that action or because that action harms the debtor's property. It logically follows that Continental's having an interest adversary to the IBT's or even its being adversely affected by this NMB proceeding should not, by itself, render the proceeding "against" Continental for the purposes of the automatic stay.

### 4. Twin purposes of § 362

This Court now construes Congress's meaning of "proceedings against the debtor" in light of the two fundamental purposes underlying § 362(a)(1).[8]

#### First purpose

Congress explained the first purpose behind the automatic stay as follows:

> It gives the debtor a breathing spell *from his creditors.* It stops all collection efforts, all harassments, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

Senate Judiciary Cmte. Report on the 1978 Bankruptcy Reform Act, S.Rep. No. 95–989, 95th Cong., 2d Sess. (1978), *reprinted*

---

7. *Cf. also In re Texas Commerce Financial,* 480 F.2d 1261, 1265–66 (5th Cir.1973).

8. For an example of this constructional approach, *see* one of the few cases interpreting the meaning of "proceeding against the debtor": *Association of St. Croix Condominium Owners v. St. Croix Hotel,* 682 F.2d 446, 448–49 (3d Cir. 1982) (concluding that given the purposes behind § 362, the phrase "proceeding against the debtor" includes appeals filed *by* the debtor if the appealed suit was originally filed against the

debtor); *see also* House Judiciary Cmte. Report on the 1978 Bankruptcy Reform Act, H.R.Rep. No. 95–595, 95th Cong, 1st Sess. (1977) *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6136–37 (recognizing the necessity of defining "property" of the debtor to further the bankruptcy policy of distributing the debtor's property to his creditors, and accordingly amending the definition of "property" to bring anything of value into the debtor's estate for disposition benefiting the creditors).

*in* 1978 U.S.Code Cong. & Ad.News 5787, 5840–41 (emphasis added) (*"Senate Report"*); *accord* House Judiciary Cmte. Report on the 1978 Bankruptcy Reform Act, H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6296–97 (*"House Report"*); *see also House Report* at 6135 (automatic stay's breathing spell gives debtor time to work constructively *with his creditors*) (emphasis added).

### *"Creditor" status*

That first purpose suggests that this IBT-instigated Board proceeding is not "against" Continental if neither the IBT nor the Board are creditors of Continental.[9]

▮▮▮ To be a "creditor", the IBT or NMB must have a "claim" against Continental. 11 U.S.C. § 101(9).[10] A "claim"

under the Bankruptcy Code requires some "right to payment". 2 *Collier* ¶ 101.09 at 101–23, 24; *see also id.* ¶ 101.04 at 101–16.-4.[11] And the law governing the transaction between the debtor and alleged claimant determines whether such a "right to payment" exists. *In re Altair Airlines*, 727 F.2d 88, 90 (3d Cir.1984). Thus, for example, when the governing federal labor law grants a union the right to sue an employer for union members' unpaid wages, the union is a "creditor" of the bankrupt employer. *Id.; see also In re Schatz Federal Bearings*, 5 B.R. 543, 2 C.B.C.2d 741, 746–47 (Bankr.S.D.N.Y.1980).

▮▮▮ The law governing the transaction at issue in this suit, 45 U.S.C. § 152 Ninth, does not grant the Board or IBT any right to payment from Continental. The RLA confers no enforcement powers upon the

---

**9.** This distinction based upon one's creditor status does not dispositively answer whether § 362(a) applies. *E.g. In re Lee*, 35 B.R. 452, 9 C.B.C.2d 1081, 1084–85 (Bankr.N.D.Ga.1983); *cf.* 11 U.S.C. § 362(b)(1) (which, by exempting certain criminal proceedings from § 362(a), indicates that but for that exemption government prosecutors would be subject to § 362(a) despite such prosecutors' apparent non-creditor status).

**10.** More fully, the Bankruptcy Code provision applicable to this case defines a "creditor" as follows:

"creditor" means—

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

(B) entity that has a claim against the estate of a kind specified in section 502(f), 502(g), 502(h) or 502(i) of this title; or

(C) entity that has a community claim.

11 U.S.C. § 101(9).

Paragraphs (B) and (C) of § 101(9) add two classes of entities to the definition of creditor which are not relevant here. Paragraph (B) adds certain holders of claims that will be deemed to arise before the date of the filing of the petition, namely those injured by the rejection of an executory contract or unexpired lease [section 502(g)], certain investment tax credit recapture claim holders [section 502(i)], "involuntary gap" creditors [section 502(f)], and certain holders of the right of set-off [section 502(h)]. 2 *Collier* ¶ 101.09 at 101–22, 23. Paragraph (C) adds creditors with claims against the debtor's community property. *Id.* at ¶ 101.06. To be a creditor under the remaining Paragraph (A), one must simply be an "entity" and have a "claim". *In re Schatz Federal Bearings*, 5 B.R.

543, 2 C.B.C.2d 741, 745 (Bankr.S.D.N.Y.1980); *see also In re Altair Airlines*, 727 F.2d 88, 89–91 (3d Cir.1984). ·

The NMB is an "entity" under the Bankruptcy Code since the Board is a governmental unit. 11 U.S.C. § 101(14).

The Code's labyrinth of definitions similarly leads to the conclusion that the IBT is an "entity". *Altair Airlines*, 727 F.2d at 89–90, *Schatz Federal Bearings*, 5 B.R. 543, 2 C.B.C.2d at 745. A "person" is an "entity". 11 U.S.C. § 101(14). A "corporation" is a "person". 11 U.S.C. § 101(33). And an "unincorporated association" is a "corporation". 11 U.S.C. § 101(8)(A)(iv). Labor unions are specifically included in the Code's concept of "unincorporated association". *Schatz Federal Bearings*, 5 B.R. 543, 2 C.B.C.2d at 745–46 (citing *House Report* at 6266 and *Senate Report* at 5808).

Since the IBT and NMB are therefore both "entities", their creditor status hinges upon whether they have a "claim" against Continental.

**11.** More fully, the Bankruptcy Code defines "claim" as an

(A) *right to payment,* whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance *if* such breach *gives rise to a right to payment,* whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(4) (emphasis added).

NMB. *Switchmen's Union of North America v. NMB,* 320 U.S. 297, 305, 64 S.Ct. 95, 99, 88 L.Ed. 61 (1943); *Delpro Co. v. NMB,* 509 F.Supp. 468, 475 (D.Del.1981). And even if these NMB proceedings eventually concluded with an IBT certification, the only remedy to Continental's refusal to bargain would be a civil *injunction* action by the IBT to compel bargaining. *American Air Export & Import v. O'Neill,* 221 F.2d 829, 831 n. 12 (D.C.Cir.1954); *Delpro,* 509 F.Supp. at 475. Since neither the Board nor the Teamsters derive any "right to payment" from these NMB proceedings, they are not "creditors" from whom the automatic stay is designed to protect Continental.

### Harassment and financial pressure

These NMB proceedings, moreover, do not involve the creditor-instigated type of "collection", "harassment", or "foreclosure actions" from which Congress designed the stay to offer debtors a breathing spell. Nor does applying the stay here serve the purpose of relieving those "financial pressures that drove [Continental] into bankruptcy."

The U.S. Supreme Court has emphasized that the RLA does not compel carriers to reach any agreement with their employees' certified representative. Section 152 Ninth merely commands those preliminary steps without which no employer-employee agreement could be reached. It provides for the orderly selection and certification of a representative to bargain on the employees' behalf, and requires the employer to confer with that certified representative in some reasonable effort to settle employer-employee differences. *Railway Clerks,* 380 U.S. at 658, 85 S.Ct. at 1196 (quoting *Virginian R. Co. v. System Federation No. 40,* 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937)). Carriers are not considered parties to NMB proceedings, and the NMB cannot subpoena their employee records. *TWA,* 107 LRRM at 2577. Thus although NMB proceedings might impose

some incidental burdens upon carriers,[12] the only direct burden entails the NMB's statutory authority to have access to carrier records when necessary. 45 U.S.C. § 152 Ninth; *TWA,* 107 LRRM at 2577. Indeed, Continental implicitly concedes the insignificance of any direct harassment or financial pressure imposed by NMB proceedings, for the end result sought by its Complaint is to initiate from scratch yet another full-blown craft/class investigation by the Board.

Continental argues, however, that the substantial costs of responding to any IBT campaigning would irreparably harm Continental's reorganization efforts. At best, that argument is irrelevant—for Continental's anti-union activity is a purely voluntary undertaking. At worst, the substantial expenditures contemplated could possibly be illegal—for the RLA repeatedly prohibits carriers from in any way interfering with or influencing employees' organizational efforts or choice of a bargaining representative.[13]

■ Suggesting that the Board's questionable craft/class investigation can result in substantial harassment, Continental also claims that § 152 Tenth imposes criminal penalties for a carrier's refusal to bargain with a certified employee representative— even when the certification is based upon an improper craft/class determination. Since no union has yet been certified, that argument is premature. It is also fallacious. Section 152 Tenth expressly limits its penalties to carrier violations of the Third, Fourth, Fifth, Seventh, and Eighth paragraphs of Section 152. 45 U.S.C. § 152 Tenth. Violations of the paragraph imposing upon carriers the duty to bargain —§ 152 Ninth—therefore involve no criminal penalties. *Delpro,* 509 F.Supp. at 468; *see also American Air,* 221 F.2d at 831.

Continental also argues that a certification based upon the allegedly improper August 11th craft/class designation would undermine its successful reorganization. It

---

**12.** *See e.g. Railway Clerks,* 380 U.S. at 668, 85 S.Ct. at 1201; *TWA,* 107 LRRM at 2577.

**13.** *Supra* text at p. 351.

bases that argument upon the claim that keeping its passenger service and fleet service employees separate would destroy its flexibility, while ignoring that separation would subject it to economic sanctions such as strikes for refusal to bargain. That argument, too, is premature. Continental's obligation to recognize and collectively bargain with those separate units—or else risk economic sanctions—does not arise until *after* the NMB issues a certificate based upon those separate crafts/classes. 45 U.S.C. § 152 Ninth. Moreover, if Continental is correct that a certification based upon those separate units would render the certificate legally invalid, then the harassing obligations Continental cites would not arise even after certification—for those RLA obligations do not exist absent a *valid* NMB certificate. *Scheduled Skyways v. NMB*, 738 F.2d 339, 343 (8th Cir.1984). At this pre-certification juncture, no one knows whether the certificate will issue or whether the Board will decide to base that possible certificate upon its 1983 craft/class determination. Any harassment or financial pressure imposed by such a certificate is therefore entirely speculative. Indeed, Continental's Appeal Brief represents to this Court that Continental's employees object to the IBT election, and that they are with loyalty and dedication working with management to ensure Continental's survival. If that is true, any future threat posed by IBT certification is not only speculative but also very unlikely.

▮ The case law specifically analyzing carriers' standing to object to NMB pre-certification proceedings supports this Court's conclusion that the NMB proceedings here threaten no harassment or financial pressure sufficient to warrant the automatic stay of § 362(a)(1). The carrier in *TWA*, for example, attacked the NMB's decision to conduct a second election before deciding whether to certify a union. 107 LRRM at 2578. The carrier claimed that the additional election would distract its employees and disrupt its operations. The court, however, found any harm of that sort "too speculative and minimal" to generate standing. *Id.* Also claiming that the sec-

ond election was improper under § 152 Ninth, the carrier cited the adverse economic consequences of having to bargain with an improperly certified union. The court readily acknowledged that such harm might generate *post*-certification standing for the carrier to challenge any union certificate issued as a result of the second election. But it held that until the NMB decided whether or not to certify a union, such carrier harm was only prospective—indeed the Board might decide not to certify any union at all. *Id.* at 2578–79. Having so addressed the carrier's claimed harms, the court concluded that the carrier had no pre-certification standing since the carrier was "unable to allege any injury in fact" from the NMB's pre-certification proceedings. *Id.* at 2578. Similarly concluding that the carrier was "unable to allege any palpable injury in fact suffered as a result of the Board's decision to hold an election," the *Air Florida* court held that "[u]ntil an election and possible certification, [the carrier's] harm is too speculative and minimal to generate standing to challenge the [NMB] investigation's form and scope." *Air Florida v. NMB*, 534 F.Supp. 1, 5 (S.D.Fla.1982) *appeal dismissed* 720 F.2d 686 (1983). The uniform holding of such cases that NMB pre-certification activities threaten no palpable injury-in-fact sufficient to overcome the nominal threshold required to generate standing bolster's this Court's conclusion that the NMB proceedings here do not inflict upon Continental the type of harassment or bankruptcy-causing financial pressure from which Congress designed § 362(a)(1) to protect debtors.

### Second purpose

Congress explained its second reason for enacting § 362 as follows:

The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankrupt-

cy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

*Senate Report* at 5835; *House Report* at 6297; *accord 2 Collier* ¶ 362.04 at 362–27; *Cornfield v. Investors' Overseas Services, Ltd.*, 471 F.Supp. 1255, 1260 (S.D.N.Y.) *aff'd without op.* 614 F.2d 1286 (1979); *In re Alyucon Interstate Corp.*, 12 B.R. 803, 806 (Bankr.D.Utah 1981).

As the prior discussion explains, neither the NMB nor IBT are creditors of Continental. That discussion also establishes that these pre-certification proceedings will not result in the payment of any claims in preference to or to the detriment of existing creditors. Staying these NMB proceedings therefore does not serve the automatic stay's second purpose of preventing a chaotic and uncontrolable scramble among creditors to claim the debtor's assets.

### Conclusion under twin purposes

Since staying the Board's proceedings serves neither of the purposes behind the automatic stay, this Court must conclude that those proceedings are not "against the debtor" within the meaning of § 362(a)(1).

### 5. A somewhat analogous NLRB case

The reasoning of *In re American Buslines*, 151 F.Supp. 877 (D.Neb.1957), supports this Court's conclusion that NMB representation proceedings are not "against the debtor" for § 362(a)(1) purposes. *American Buslines* can be distinguished on many grounds: Rather than construing § 362, it involved a mixed question of jurisdiction under the old Bankruptcy Code and interpreting a prior court order. Rather than the NMB, it involved the slightly different [14] NLRB. And rather than involving nonunionized employees, it involved a group of already organized and represent-

ed workers. Recognizing those distinctions, this Court nonetheless finds *American Buslines'* reasoning persuasive.

*American Buslines* analyzed the court's power to stay an NLRB representation proceeding involving a bankrupt employer. Specifically, it addressed whether a prior court order enjoining actions against the debtor and his property required that stay, and whether bankruptcy's limited jurisdiction under the old statutes authorized that stay. The court began by recognizing that the pending NLRB representation proceedings could likely consume many months and pose harassing problems to the employer's reorganization. *Id.* at 880 n. 1. Nonetheless, in denying the stay the court concluded that the NLRB proceeding could not "rationally be regarded as a suit against the debtor or its trustee." *Id.* at 886.

Like the RLA, the National Labor Relations Act's definition of covered employers includes "trustees" and "receivers". 29 U.S.C. § 152. Noting that definitional provision, the *American Buslines* court held:

The existence or intervention of bankruptcy, or corporate reorganization of an employer is not allowed to deprive ... employees of the rights defined and assured to them by the Act or to impair or ... to alter the manner of or the forum for the assertion and vindication of those rights.

*Id.* Through the course of its discussion the court further explained:

What is chiefly sought in the proceeding before the Board is a) the determination ... of an appropriate bargaining unit ... and b) the choice by the persons within that unit of their bargaining representative. Those problems are the business of the affected employees, not of the debtor....

\* \* \* \* \* \*

**14.** The National Labor Relations Action (NLRA) is much like the RLA. It grants employees the right to organize and chose a collective bargaining representative. *American Buslines,* 151 F.Supp. at 882. Its provisions concerning union applications, NLRB investigations, NLRB bar-

gaining-unit determinations, and final union certification basically mirror the RLA. *See id.* at 882–83. Finally, the NLRA specifically applies to bankrupt employers much like the RLA does. *Id.* at 882, 886.

It is a matter to be resolved by the affected employees themselves under the guidance of, and subject to the eventual certification of the result by, the Board.

\* \* \* \* \* \*

So understood, it involves, too, a purely preliminary or interlocutory matter, one of which the results may never have any impact, either direct or oblique, upon the [debtor's estate] or the business of that [estate].

\* \* \* \* \* \*

Whoever the bargaining representatives may ultimately be, the trustee ... will be expected to treat with them as the representatives of the employees in the determined unit. It may not be assumed at the present time that those negotiations will ... result in injury to the trust....

\* \* \* \* \* \*

The court is not so naive as to assert that, as employers, the debtor and its trustee ... can have no possible emotional concern about the course of that action. They may easily, and with abundant reason, prefer to deal with one bargaining unit rather than another or to negotiate with one bargaining agency rather than another. But there is not much they may properly or prudently do about those choices, which are to be exercised by the employees, not by the employer. Once the unit is defined and the bargaining agency determined, management will necessarily deal with it, presumably in the mutual interest of both employer and employees, but in some measure perhaps in an adversary way.

That being true, it does not lie with management either to control, to veto, or altogether to intercept the free selection by its employees of their representatives at the bargaining table. So far, no more is involved.

*Id.* at 882–887.[15] Since it incorporates many of this Court's prior conclusions concerning NMB proceedings, the *American Buslines* reasoning further supports this Court's holding that NMB proceedings are not "against the debtor" within the meaning of § 362(a)(1).

*6. Conclusion concerning § 362*

This Court has now examined the meaning of "proceedings against the debtor" from five perspectives. Each one points to but one conclusion: these NMB proceedings are not "against the debtor" within the meaning of § 362(a)(1). This Court must therefore hold that the Bankruptcy Court erroneously applied the automatic stay.

*C. Section 105 Discretionary Stay as Possible Ground to Uphold the Bankruptcy Court*

 Noting that this Court can uphold the Bankruptcy Court's stay on an alternative theory,[16] Continental urges this Court to apply the discretionary stay of 11 U.S.C. § 105.[17] This Court therefore addresses the applicability of a § 105 stay.[18]

In enacting § 105, Congress explained that despite certain actions' exemption from § 362, a bankruptcy court

has ample other powers to stay actions not covered by the automatic stay. Sec-

---

**15.** This Court rearranged the order of the above-quoted separate findings of *American Buslines* to better flow with this Court's prior discussion of § 362.

**16.** *E.g., Massachusetts Mutual Life Ins. v. Ludwig,* 426 U.S. 479, 481, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784 (1976); *Hoyt Matise Co. v. Zurn,* 754 F.2d 560, 565 n. 5 (5th Cir.1985).

**17.** Continental has apparently abandoned its original Complaint's third injunction basis, 28 U.S.C. § 1651. That makes sense since 11 U.S.C. § 105 incorporates the injunctive powers of 28 U.S.C. § 1651. *House Report* at 6298.

**18.** Citing *In re Braniff Airways,* 700 F.2d 935, 942 & n. 5 (5th Cir.1983) and *NLRB v. Evans Plumbing,* 639 F.2d 291, 293 n. 3 (5th Cir.1981), the defendants claim that this Circuit has not yet decided whether a bankrupt can invoke § 105 against governmental actions such as these NMB proceedings. As the legislative history this Court soon refers to indicates, however, Congress clearly intended § 105 to apply to governmental regulatory activity. *Infra* at p. 358. This Court therefore analyzes the appropriateness of applying a § 105 discretionary stay in this case.

tion 105 ... grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The bankruptcy courts are brought within the scope of the All Writs Statute, 28 U.S.C. 1651 (1970), and are given the powers of a court of law, equity, and admiralty. Stays or injunctions issued under these other sections ... will be granted or issued under the usual rules for the issuance of injunctions.... [T]he court will have to determine on a case by case basis whether a particular action which may be harming the estate should be stayed.

*House Report* at 6298. In assessing the propriety of a § 105 stay in this case, this Court therefore bears in mind traditional equitable principles governing injunctions.

Of particular importance to this case, Congress noted that under pre-Section 105 law, some courts had overused the bankruptcy stay to enjoin state regulatory actions. *Id.* at 6135–36. Congress therefore intended the new § 105 to require courts

to examine the State actions more carefully, and with a view to protecting the legitimate interests of the State as well as of the [bankrupt's] estate, before it may enjoin actions against the debtor or the estate.

*Id.* at 6135. Given that specific intent to protect governments' regulatory interests, the federal rights and interests furthered by the RLA warrant this Court's special consideration.

■ As previously explained, the RLA furthers Congress's strong policy of guaranteeing employees' the right to organize and collectively bargain free from any carrier interference or influence.[19] Yet delays in NMB pre-certification proceedings seriously hamper such organizational efforts. As the Supreme Court has recognized,

When an employee organization has built up its membership to a point where it is entitled to be recognized as the representative of the employees for collective bargaining, and the employer refuses to accord recognition, the union, unless an election can promptly be held to determine the choice of representation, runs the risk of impairment of strength by attrition and delay while the case is dragging on through the courts....

*Boire v. Greyhound Corp.*, 376 U.S. 473, 478, 84 S.Ct. 894, 897, 11 L.Ed.2d 849 (1964) (quoting NLRA legislative history). Speed is accordingly an RLA "objective of the first order," *Railway Clerks*, 380 U.S. at 668, 85 S.Ct. at 1201;[20] and the damage caused by staying an NMB election is often substantially greater than that caused by allowing an election to go ahead, *cf. Air Canada v. NMB*, 478 F.Supp. 615, 618 (S.D. N.Y.1979). The special consideration due this judicial recognition that delays seriously harm the RLA's primary purpose weighs heavily against further enjoining under § 105 these NMB proceedings.

The concomitant damage Continental has managed to inflict by thus far delaying the elections over 15 months also weighs against granting Continental an equitable § 105 stay.

Finally, Continental's present bankrupt condition does not counterbalance those factors weighing against the stay. As the prior discussion construing "against the debtor" demonstrated, these NMB proceedings inflict little or no harm upon Continental, its assets, or its creditors.

The § 105 stay can therefore offer no refuge to Continental.

### D. Conclusion Concerning the Appeal

Sections II.B and II.C explain why neither § 362 nor § 105 can support a stay here. Accordingly, the Bankruptcy Court's

---

19. *Supra* text at p. 351.

20. *See also U.S. v. Feaster,* 410 F.2d 1354, 1359 (5th Cir.) *cert. denied* 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969) (recognizing the RLA's

"statutory command to attain a prompt and orderly settlement of labor disputes" through NMB representational proceedings); *Delpro,* 509 F.Supp. at 472, 474.

imposition of the stay against these NMB proceedings must be reversed.[21]

## III. THE MOTIONS TO WITHDRAW THE REFERENCE

■ Now free of the Bankruptcy Court's stay, the defendants' further ask this Court to withdraw the reference of this lawsuit. Continental objects citing the untimeliness of defendants' withdrawal motions, the Bankruptcy Court's familiarity with this case, and the Bankruptcy Court's bankruptcy expertise.

Resolving the defendants' dismissal motions will require a careful application of standing and ripeness doctrines to the NMB craft/class investigations mandated by the RLA. Given the inapplicability of the Bankruptcy Code to that analysis, the dismissal motions do not particularly lend themselves to the special legal expertise of the Bankruptcy Court.

Nor does the Bankruptcy Court's familiarity with this proceeding afford it much relevant factual expertise, for the facts with which this Court had to familiarize itself to decide the appeal considerably ov-

erlap with those necessary to resolve the dismissal motions. Continental is hard pressed to urge otherwise, for it had previously represented to this Court that the facts governing the appeal and dismissal motions are "nearly identical".[22]

The Bankruptcy Court, moreover, cannot dispositively rule on the surviving portion of Continental's Complaint—i.e., the declaratory judgment action. The 1984 Bankruptcy Amendments and Federal Judgeship Act ("1984 Act") provides that in such a non-core proceeding

> the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

28 U.S.C. § 157(c)(1). This Court strongly suspects that if it does not withdraw the reference, it will only see this exact same lawsuit again in the future on such a de novo review. That duplication of judicial effort would needlessly waste this Dis-

---

**21.** At this point, this Court notes that an alternative rationale—totally independent of the Bankruptcy Code—could support this Court's decision. Ironically, that rationale rests upon Continental's previous success in *IBT v. Texas International Airlines,* 717 F.2d 157 (5th Cir.1983) ("*TIA* ").

As previously explained in Section I.B of this opinion, the IBT had had a collective bargaining contract with Texas International Airlines ("TIA"). After TIA and Continental merged, Continental claimed that that contract was void and no longer protected the former-TIA employees. The IBT accordingly sought a declaratory judgment that that contract was still valid.

Siding with Continental, the *TIA* court first noted the NMB's exclusive jurisdiction to resolve representational disputes, and stated that:

> A court may not entertain an action involving such a dispute *even if it arises in the context of otherwise justiciable claims....* Moreover, a court may not grant injunctive relief maintaining the status quo if the underlying dispute is representational in nature, because to do so would necessarily have the effect, at least during the period of the injunction, of deciding the representation issue.

*Id.* at 161 (emphasis added; citations omitted). The court then observed that enforcement of the

IBT contract "inescapably entailed the continuance of the Union's role as employee representative for the [former-TIA employees]." *Id.* Since "[c]ontinuation of the contract in force unavoidably constitute[d] a determination of employee representation," *id.*, the court upheld the district court's refusal to grant the IBT equitable relief in its otherwise justiciable contract action, *id.* at 164.

Similarly here, Continental's stay request arises in the context of an otherwise justiciable controversy. Yet granting the stay also inescapably has the practical effect of deciding the pending representational dispute—only this time against the IBT. The holding which Continental prompted in *TIA* therefore seems to require this Court to deny Continental its sought after stay.

*TIA,* however, does not deal with the careful balancing often necessary to accommodate the conflicting federal policies underlying Congress's bankruptcy and labor legislation. This Court therefore choses to base its decision solely upon its analysis of §§ 362 and 105 rather than rely upon *TIA.*

**22.** Continental's Motion for Leave to Consolidate its Response to the Appeal and the Dismissal Motions, ¶ 4.

trict's limited resources. It would also defy the RLA's "statutory command to attain a prompt and orderly settlement of labor [representation] disputes." *Feaster,* 410 F.2d at 1359; *see also generally supra* text at p. 358.

Much like the Emergency Bankruptcy Rule previously applicable to this lawsuit,[22a] The 1984 Act provides that

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that the resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d). While that second clause might not apply when some "other law" only tangentially affects the proceeding, it surely does apply when federal labor legislation will likely be material to the proceeding's resolution.[23] To that Continental rejoins that the Board's withdrawal motion is untimely since the Board delayed filing that motion for about five months. Regardless of whether that delay constitutes sufficient untimeliness to defeat mandatory withdrawal, however, this Court concludes that the Bankruptcy Court's having no more relevant factual or legal expertise than this Court, coupled with the special need for an expeditious and dispositive ruling on this NMB issue, constitutes ample cause to withdraw the reference. Accordingly, the defendants' motions to with-

draw the reference of this adversary proceeding will be granted.

The remainder of this Court's opinion focuses upon the defendants' motions to dismiss Continental's Complaint. In that process this Court also disposes of the parties' various discovery motions.

## IV. MOTIONS TO DISMISS: STANDING

██ ██ To have constitutional standing, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975) (emphasis in original). Since this Court's Article III judicial power exists only to redress or otherwise protect against injury to the complaining party, Continental can invoke this Court's jurisdiction only if it suffers some threatened or actual injury resulting from the NMB's putatively illegal action. *Id.* at 499, 95 S.Ct. at 2205. The defendants accordingly object that until the Board decides whether or not to certify the IBT, Continental has no interest in the NMB proceeding sufficient to generate standing to attack the statutory sufficiency of the Board's craft/class investigation.

That objection has great merit. As this Court previously explained, cases specifically addressing this standing issue uniformly conclude that NMB pre-certification proceedings inflict no palpable injury-in-fact upon carriers, and that carriers therefore lack standing to attack pre-certifica-

---

**22a.** The relevant Bankruptcy Emergency Rule for the Southern District of Texas provided:

> (c) Reference to Bankruptcy Judges....
> (2) The reference to a bankruptcy judge may be withdrawn by the district court at any time on its own motion or on timely motion by a party. A motion for withdrawal of reference shall not stay any bankruptcy matter pending before a bankruptcy judge unless a specific stay is issued by the district court. If a reference is withdrawn, the district court may retain the entire matter, may refer part of the

> matter back to the bankruptcy judge, or may refer the entire matter back to the bankruptcy judge with instructions specifying the powers and functions that the bankruptcy judge may exercise. Any matter in which the reference is withdrawn shall be reassigned to a district judge in accordance with the court's usual system for assigning civil cases.

**23.** *See e.g.,* 130 Cong.Rec. H–1849–50 (daily ed. March 21, 1984); 130 Cong.Rec. S 7622 (daily ed. June 19, 1984).

tion proceedings.[24] This Court's discussions concerning the NMB proceedings' nature,[25] the RLA's mandates,[26] debtor harassment and financial pressure,[27] and *American Buslines*,[28] all demonstrate that Continental's bankrupt status does not inject sufficient additional injury to affect those standing cases' applicability here.

 Since employees clearly have a strong interest in these representation proceedings, Continental also mentions that it filed this suit to protect its employees' right to have the NMB's certification decision based upon a proper craft/class designation. As a general rule, however, a plaintiff cannot so rest his standing upon a third party's right or interest. *E.g.*, *Warth*, 422 U.S. at 499, 2205; *Lamoille*, 539 F.Supp. at 245. Countervailing policy considerations occasionally persuade courts to grant standing as an exception to that rule—a decision which in effect determines that the statute implies a right of action for that particular class of plaintiff. *E.g.*, *Warth*, 422 U.S. at 500–01, 95 S.Ct. at 2205–06; *Lamoille*, 539 F.Supp. at 245 n. 29. But Continental cites no such countervailing considerations here. Nor can this court imagine any. The prior discussion of the NMB proceedings' nature and carriers' non-party status demonstrated that carriers fall far outside the zone of interests protected and advanced by representation proceedings under § 152 Ninth.[29] Indeed, the RLA repeatedly prohibits carriers from in any way influencing or interfering with these proceedings.[30] Continental therefore cannot secure pre-certification standing to attack the NMB's craft/class investigation by invoking its employees' interests. *Lamoille*, 539 F.Supp. at 247.

*International In-Flight Catering v. NMB*, 555 F.2d 712 (9th Cir.1977); *British Airways Board v. NMB*, 685 F.2d 52 (2d Cir.1982); and other cases which Continental cites in direct support of its pre-certification standing are simply inapposite—for they involve *post*-certification standing. As the *TWA* court recognized, carriers' legal obligation to bargain with the certified union may cause sufficient injury to generate carrier post-certification standing to challenge the propriety of that union's certification. *TWA*, 107 LRRM at 2578–79. The *In-Flight Catering* court accordingly held that the carrier had limited post-certification standing to "challenge its having to deal with an unlawfully and improperly certified bargaining representative." 555 F.2d at 719. Similarly the *British Airways* court granted the carrier post-certification standing "to challenge NMB decisions concerning the certification of the representative of its employees." 685 F.2d at 55.

It seems obvious from the above discussion that carriers should not enjoy standing to interfere with ongoing *pre*-certification proceedings. Nonetheless the U.S. Supreme Court and Fifth Circuit have both implicitly sanctioned such standing.

A carrier and an association of its employees filed the pre-certification suits in *Railway Clerks* to challenge the NMB's proposed ballot form and the sufficiency of the Board's craft/class investigation. The district court dismissed the carrier's suit on grounds assumed by the Appellate Court to have been lack of standing. The Second Circuit affirmed that dismissal. The certiorari petition specifically included as one question: "Does the carrier have judicial standing to complain of the ballot form?" The Supreme Court granted the petition without limitation. *British Airways*, 685 F.2d at 55 (discussing *Railway Clerks'* history). Without mentioning any standing problems, the Court resolved the carrier and employee association's joint complaints about the ballot form. *Railway Clerks*, 380 U.S. at 668–71, 85 S.Ct. at 1201–03.

---

**24.** *Supra* text at p. 355.

**25.** *Id.* at pp. 350–351.

**26.** *Id.* at p. 351.

**27.** *Id.* at p. 354.

**28.** *Id.* at pp. 356–357.

**29.** *Id.* at pp. 350–351.

**30.** *Id.* at p. 351.

The employee association, moreover, had dropped its challenge to the Board's investigation. *Id.* at 660, 85 S.Ct. at 1197. Nonetheless the Court adjudicated the merits of the carrier's attack on the statutory and constitutional sufficiency of the Board's craft/class investigation. *Id.* at 660–668, 85 S.Ct. at 1197–1202. This District Court must therefore read *Railway Clerks* as an implicit recognition of carriers' pre-certification standing.

In *U.S. v. Feaster*, 410 F.2d 1354 (5th Cir.) *cert. denied* 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969), the employer filed a pre-certification suit challenging the NMB's determination in a § 152 Ninth representation proceeding that the employer was a "carrier" subject to the RLA. Although the Fifth Circuit dismissed the suit on ripeness grounds, it addressed the employer's complaint without mentioning any pre-certification standing problems.

■ Despite the persuasiveness of defendants' arguments, this Court is unwilling to deny standing to a party whose standing the Supreme Court and Fifth Circuit have both implicitly recognized. This Court must therefore conclude that Continental has standing to bring this suit.

## V. MOTIONS TO DISMISS: RIPENESS

■ The ripeness doctrine [31] generally bars any judicial review of non-final administrative agency actions. Citing that doctrine, defendants' object that until the Board either certifies the IBT or dismisses the IBT's application, the Board's actions are not final and thus are not ripe for judicial review. The defendants accordingly conclude that this Court lacks subject matter jurisdiction to hear Continental's Complaint.

### A. Distinguishing the "Ripeness" Doctrine from the "Limited Scope of Judicial Review" Doctrine

All three parties submit powerful arguments on this ripeness issue amply supported by case law. Unfortunately though, all too many of the cases confuse the ripeness doctrine with the related doctrine limiting the scope of judicial review of final (and thus ripe) agency actions.

Despite these two doctrines' relatedness, they serve different purposes. Subject matter jurisdiction in any given case might therefore exist under one doctrine but be barred by the other.[32] Thus before this Court addresses the ripeness issues in this suit it must carefully distinguish these two doctrines and the purposes they serve.

### 1. Doctrine limiting the scope of judicial review of final, ripe agency actions

This doctrine drastically limits the scope of the review to which courts will subject an administrative agency's final action. Thus even after the NMB has finalized its administrative process by issuing a representation certificate, that certification is not ordinarily subject to judicial review. *American Air*, 221 F.2d at 830. The Fifth Circuit accordingly maintains that the scope of judicial review in RLA cases is "among the narrowest known to the law." *Air Line Pilots Association International v. Eastern Air Lines*, 632 F.2d 1321, 1323 (5th Cir.1980) ("*ALPA* ").[33]

That limited review of final NMB actions promotes the strong RLA policy of expeditiously and dispositively resolving representation disputes. *International Association of Machinists & Aerospace Workers v. NMB*, 425 F.2d 527, 535–36 (D.C.Cir. 1970) ("*IAM* ").[34] The doctrine rests also

---

**31.** Courts often use interchangeably the terms "ripeness doctrine" and "exhaustion (of administrative remedies) doctrine". *E.g. Feaster,* 410 F.2d at 1366, 1366 n. 11, 1368; *American General Ins. v. FTC,* 496 F.2d 197, 199–01 (5th Cir. 1974). For clarity this Court uses the term "ripeness doctrine" throughout this opinion.

**32.** *See e.g., Chicago Truck Drivers v. NMB,* 670 F.2d 665, 668 & n. 5 (7th Cir.1981); *Delpro,* 509 F.Supp. at 472–74 & n. 7.

**33.** *See also Feaster,* 410 F.2d at 1363 (judicial review of final NMB determinations is "very, very limited").

**34.** *Cf. supra* text at p. 358.

upon the judiciary's confidence that the NMB can, especially in light of its experience and expertise, reasonably vindicate employees' RLA rights without court involvement. *IAM*, 425 F.2d at 535–36.[35] The third rationale behind that very limited review stems from the source of the employees' right to representation. *IAM*, 425 F.2d at 535–36. Congress created that right. And Congress decided upon NMB proceedings as the method to protect that right, concluding that court review of NMB determinations is unnecessary. *Id.* As the Supreme Court has stated concerning the RLA provisions governing NMB representation proceedings,

> the intent seems plain—the dispute was to reach its terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law.

*Railway Clerks*, 380 U.S. at 659, 85 S.Ct. at 1197 (quoting *Switchmen's Union of North America v. NMB*, 320 U.S. 297, 305, 64 S.Ct. 95, 99, 88 L.Ed. 61 (1943)).

The limited scope of review doctrine therefore reflects three judicial purposes: (1) to promote the fast, dispositive NMB determinations envisioned by the RLA; (2) to display deferrence to, and confidence in, NMB experience and expertise; and (3) to respect Congress's delegation to the NMB of authority to resolve representation disputes.

### 2. Ripeness doctrine

In contrast to the above doctrine limiting the judiciary's *scope* of review, the ripeness doctrine mandates that as a general rule courts should not conduct *any* review—limited or otherwise—of agency actions until the complained of action progresses to the point that it becomes "final" and thus "ripe" for judicial review.

The three previously discussed policies concerning speed, deference, and Congressional delegation also support the ripeness doctrine. Indeed, the purpose of promoting fast NMB determinations supports the ripeness doctrine's ban against interrupting ongoing NMB proceeding more strongly than it supports the other doctrine's limitation of review after those proceedings culminate in a union certification.[36]

Dispite those three overlapping policy supports, however, the ripeness doctrine fully rests upon a conceptually distinct underpinning. The first unique purpose underlying the ripeness doctrine is to avoid premature interruptions in the administrative process. *American General Ins. v. FTC*, 496 F.2d 197, 200 (5th Cir.1974). Allowing judicial review of interim agency decisions before the agency's entire action becomes final would deny the agency "an opportunity to correct its own mistakes and to apply its expertise." *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980). Such intervention "also leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." *Id.* The ripeness doctrine therefore serves the additional goal of judicial economy. *American General*, 496 F.2d at 200. Similarly, by discouraging the flouting of the administrative process, the doctrine facilitates smooth and efficient agency determinations. *Id.* Finally the ripeness doctrine serves to protect the administrative and executive autonomy of administrative agencies. *Id.* In recognition of that autonomy the Fifth Circuit has, after noting the NMB's exclusive jurisdiction to decide representation issues, held that

> a court may not grant injunctive relief maintaining the status quo if the underlying dispute is representational in nature, because to do so would necessarily have the effect, at least during the period of the injunction, of deciding the representation issue.

*TIA*, 717 F.2d at 161. This respect afforded agency autonomy has farreaching implications—for Congress does not contemplate court jurisdiction to prevent the mis-

---

**35.** *See also infra* text at pp. 371–372.

**36.** *Cf. Delpro*, 509 F.Supp. at 474.

use of administrative powers by imposing *prior* restraints upon an agency's exercise of those powers. *American General*, 496 F.2d at 200 (emphasis added).

The ripeness doctrine therefore also serves additional purposes distinct from the purposes behind the limited scope of review doctrine. Those four additional purposes are: (1) to avoid prematurely interrupting NMB proceedings; (2) to promote judicial economy; (3) to sustain respect for the NMB's administrative process; and (4) to protect the NMB's autonomy.

### 3. Conclusion

Recognizing that a hasty or careless misapplication of the wrong doctrine could produce an incorrect result, this Court will constantly bear in mind those four unique purposes behind the ripeness doctrine as it proceeds to analyze the defendants' ripeness objection.

### B. The Ripeness Doctrine's General Rule

 Under the ripeness doctrine's general rule, "only *final* agency action for which there is no other adequate remedy in a court is subject to judicial review." *Chicago Truck Drivers*, 670 F.2d at 668 (emphasis in original; citations omitted); *see also Feaster*, 410 F.2d at 1363–64.[37] The application of the ripeness doctrine's general rule in this case accordingly turns upon whether the NMB craft/class investigation of which Continental complains is "final".

### 1. NMB action not final until certification issued?

The defendants argue that no NMB action is final until the Board decides to ei-

ther issue a certificate or dismiss the union's application.

The *Feaster* court held that an NMB determination that an employer is a "carrier" subject to the RLA is not "final" until the Board issued a certificate. As the court explained:

> The administrative process ... remains incomplete because the election has not been held and the Mediation Board's certificate, which "is the ultimate finding of fact prerequisite to enforcement by the courts," has not been issued.

410 F.2d at 1364; *see also TWA* 107 LRRM at 2578 ("It is well established that judicial review of the Board's actions in a representation dispute is available, if at all, only after the Board completes its investigation, an election has been held which the Board recognizes, and the Board finally either certifies a union or issues a notice of dismissal without certifying any union."); *Delpro*, 509 F.Supp. at 473 & n. 7 (rejecting the carrier's claim that the court had pre-certification jurisdiction to examine NMB proceedings, and stating that "[j]urisdiction, if any, exists because the NMB, subsequent to the filing of this lawsuit, certified the Railway Carmen as the representative of [the carrier's] employees"); *American Air*, 221 F.2d at 830. *Feaster* and its progeny therefore strongly support the defendants' contention that the NMB's craft/class investigation is not final until the Board decides whether or not to certify the IBT.

### 2. Certain NMB actions final before certification issued?

Citing developments in the ripeness doctrine which have congealed in the 16 years since *Feaster*, Continental argues that in

---

37. Siding with the plaintiff-employer's complaint that the NMB had improperly determined that the employer was a "carrier" subject to the RLA, the district court in *Feaster* had enjoined the scheduled representation elections. 410 F.2d at 1357. Noting that the NMB's determination of the employer's "carrier" status was not yet final, the Fifth Circuit stated:

> We do not now decide whether the district court will be forever foreclosed from dispensing equity in this controversy. We do hold

that here the district court was premature in such dispensation.

*Id.* at 1363–64. The court accordingly reversed for want of subject matter jurisdiction since the case was "not yet ripe for judicial involvement." *Id. See also Varig Brazilian Airlines v. NMB*, 112 LRRM 3348, 3350 (E.D.N.Y.1983) (applying *Feaster's* ripeness analysis to a carrier's pre-certification challenge to NMB proceedings); *Air Florida*, 534 F.Supp. at 5, 12–15 (same).

this particular case the Board's craft/class investigation is final. In support it alleges that: the Board has completed its craft/class inquiry, that inquiry culminated in the August 11th craft/class designation, the Board has refused to reconsider that designation despite Continental's objections, the enjoined election is based upon that designation, and the IBT certificate will be based upon those elections.

The short answer to Continental's argument is that the Board's craft/class determination here is no more final than the Board's "carrier" determination which the Fifth Circuit found unripe in *Feaster*.

The long answer, which takes into account post-*Feaster* developments in the ripeness doctrine, is that Continental fundamentally misconstrues the meaning of "final". This Court has already explained the seven purposes underlying the ripeness doctrine.[38] For an agency's action to be "final" in ripeness parlance, a court's review of that action must not unduly defeat those seven purposes. In short, the agency's action must be "definitive" and have a "direct and immediate effect on the [plaintiff's] day to day business." *Chicago Truck Drivers*, 670 F.2d at 668.[39] Continental's contention fails to satisfy either of those two requirements.

### "Definitive" action

■■■ The Board's attempt to proceed with an election does not render its craft/class investigation or its August 11th designation definitive. Elections are but one element of NMB investigations into representation disputes. *Railway Clerks*, 380 U.S. at 666, 85 S.Ct. at 1200. Before the Board issues any certificate, the Board must determine whether the election truly

indicates the representational desires of the employees. Thus in this proceeding the Board may yet consider Continental's post-bankruptcy condition before issuing a certificate. Continental must recognize that fact, for it refers this Court to many other cases in which the Board reopened investigations to account for changes in carrier operations less drastic than Continental's immediate post-bankruptcy alterations. Indeed in this proceeding the NMB declared on 10 January 1984—albeit somewhat self-servingly—that it would reconsider Continental's craft/class objections after assessing the ballot returns.

■■■ The gist of Continental's complaint is that its reduced size and bankrupt position have so comingled the duties of passenger service and fleet service employees that those employees should all be treated as one craft/class. If that contention has any merit, Continental's 10 January 1984 challenges to individual employees' eligibility to vote in one craft/class verses the other should convince the Board that separating passenger and fleet employees is infeasible or improper. Depending upon the ballots' wording, the Board might then moot Continental's present Complaint by simply combining the voting tallies into one representational unit. Or the Board might, upon such post-election reconsideration, decide Continental's craft/class objections have been mooted by Continental's significant increase in size since its 1983 bankruptcy.[40]

This whole issue could also become moot if, after ruling on the challenges to individual employees' voting eligibility and tallying the resultant eligible votes, the Board concludes that the IBT lost both elections.[41]

---

**38.** *Supra* text at pp. 362–64.

**39.** *See also F.T.C. v. Standard Oil,* 449 U.S. at 239, 101 S.Ct. at 493; *cf. Abbott Laboratories v. Gardner,* 387 U.S. 136, 149–52, 87 S.Ct. 1507, 1515–17, 18 L.Ed.2d 681 (1967).

**40.** *See e.g.* the articles attached as an appendix to the IBT's Reply Brief: New York Times, May 8, 1984 (Continental then operating at 85% of its pre-bankruptcy service level and employing

8500 workers; operations scheduled to operate at 91% of its former service level by June); Wall Street Journal, May 8, 1984 (same 85% and 91% figures); Wall Street Journal, April 5, 1984 (Continental planning to return to 100% operations by July).

**41.** Recall that Continental's successful invocation of the bankruptcy stay had forbidden the NMB's even opening the returned ballots.

Alternatively illustrating why the Board's actions are not yet "definitive" for ripeness purposes, the Board might well decide to set the 1983 election aside and order a second election based upon a different craft/class.[42] Continental and the IBT complain about the confusion surrounding the balloting in this proceeding. And Continental cites numerous NMB cases setting aside elections when the balloting was not conducted in "laboratory conditions". Thus depending upon how the Board assesses the balloting conditions and Continental's present operations, the Board may yet set aside that first election.

As those post-election possibilities illustrate, the NMB's craft/class investigation is not yet "definitive" enough to satisfy any of the ripeness doctrine's seven purposes.[43]

### "Direct and immediate impact"

Nor does the Board's craft/class treatment have the direct and immediate effect upon Continental's day to day business necessary to overcome those seven ripeness policies. As the prior discussion on "harassment and financial pressure" demonstrated, this Court can find no palpable injury-in-fact to Continental arising from the NMB's pre-certification activities.[44]

**42.** *See e.g., TWA,* 107 LRRM at 2573 (where NMB ordered a second election); *Pan American,* 275 F.Supp. at 990–91 (where NMB ordered a third election).

**43.** Apparently desiring this Court to lower the "definitiveness" standard, Continental cites the *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) line of cases for the proposition that courts can grant interlocutory review of a less-than-definitive agency determination when that determination "irreparably injures" the complaining party. That proposition is irrelevant here, for as the discussion on "harassment and financial pressure" demonstrates, Continental suffers no irreparable injury from the NMB's pre-certification activities. *Supra* text at pp. 354–355.

**44.** *Supra* text at pp. 354–55.

**45.** *Id.* at pp. 353–54, 355.

**46.** *E.g., In-Flight Catering,* 555 F.2d at 716.

**47.** *E.g. Delpro,* 509 F.Supp. at 477.

Recall also that although § 152 Ninth obligates Continental to negotiate with its employees' certified representative, the only available remedy if Continental refuses to bargain is a civil action by the certified representative for an injunction to compel Continental to negotiate.[45] If this Board proceeding does eventually culminate in certifying the IBT to represent one or both of the crafts/classes here, Continental accordingly has two adequate court remedies with which to attack the Board investigation's sufficiency: Continental can either sue to invalidate the Board's allegedly improper certification,[46] or raise the lack of a proper certification as a defense to the union's civil action to compel bargaining.[47] *British Airways,* 685 F.2d at 54 n. 1.

This Court must therefore conclude that the NMB's existing craft/class investigation and designation do not yet have the requisite "direct and immediate" effect upon Continental.[48]

### Added considerations

Congress intended the NMB *alone* to consider the representational problems which arise out of operational changes such as a carrier's bankruptcy.[49] The Fifth Cir-

**48.** Apparently desiring this Court to lower the "direct and immediate effect" standard, Continental cites *Duke Power v. Carolina Environmental Study Group,* 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978), for the proposition that a mere "possibility" of harm will suffice for ripeness purposes when a court "will be in no better position later that [it is] now" to assess the plaintiff's Complaint. That proposition is irrelevant here, for as the discussion on definitiveness illustrates, *supra* text at pp. 365–366, the Board's investigation of the proper craft/class for IBT certification has not necessarily been completed. This Court will be in a much better position to judge the statutory sufficiency of the NMB's craft/class investigation later when it can see which crafts/classes are eventually covered by any issued certificate.

**49.** *Cf. TIA,* 717 F.2d at 164 (stating with reference to Continental's merger with Texas International Airlines that Congress intended the NMB "alone to consider the post-merger problems that arise from existing collective bargaining agreements").

cuit, moreover, has declared that the ripeness doctrine's finality requirement

> is particularly appropriate to the resolution of labor representation disputes since the [RLA] places a great premium on speed and seeks to limit the opportunity for dilatory tactics which would postpone the commencement of bargaining when the employer has no substantial objections to the conduct of the election other than a desire to delay bargaining as long as possible.

*Feaster*, 410 F.2d at 1364 (citation omitted); *accord, Varig Brazilian Airlines*, 112 LRRM at 3350; *TWA*, 107 LRRM at 2578. This Court must therefore apply the finality requirement with particular rigor in this case.

Also relevant is the fact that as a carrier, Continental is not even a proper party to the NMB proceeding with which it seeks to interfere.[50] Indeed, prompt resolution of representation questions without carrier interference is a principal purpose behind the RLA. *TWA*, 107 LRRM at 2575; 45 U.S.C. § 151a; *see generally supra* text p. 12. Thus the finality requirement

> applies with even greater force where the party seeking judicial intervention is not a union directly involved in the election, but a carrier which has no role except to supply access to its books and records and receive the Board's certification, when and if it issues.

*TWA*, 107 LRRM at 2578.

In light of that background, this Court is not surprised to have found no case where a carrier has overcome the ripeness doctrine to successfully enjoin an NMB election.[51]

### 3. Conclusion concerning finality

Especially in light of the ripeness doctrine's exacting rigor in this particular case, this Court can reach but one conclusion: under the ripeness doctrine's general rule, the NMB pre-certification actions of which Continental complains are not final, and thus not yet ripe for judicial review.

### C. Exceptions to the Ripeness Doctrine's General Rule

■ Despite the NMB action's lack of finality, *Feaster*'s ripeness analysis recognizes two potentially relevant exceptions to the ripeness doctrine's general rule.[52] Those exceptions involve:

(1) complaints making a substantial showing that the Board's action has violated the constitutional rights of the complaining party; and

(2) those few situations in which the Board has clearly violated an unambiguous and mandatory provision of the statute.

*Feaster*, 410 F.2d at 1365 (citations omitted).

### 1. Constitutional violation exception

This Court initially questions whether an employer can even invoke this first exception.[53] But even assuming arguendo that this exception can apply to an employer, Continental's First Amendment and Due Process objections to the Board's conduct fall far below the requisite "substantial showing" of a constitutional violation.

#### First Amendment

■ The First Amendment argument appears to be that bankruptcy prevents Continental from devoting the time and energy it would like to inform its employees about unionization, and that therefore the Board's allowing a union certification election effectively denies Continental its right to freely speak about unioniza-

---

50. *See supra* text at pp. 350–51 (on carriers' non-party status).

51. *See also Varig Brasilian Airlines,* 112 LRRM at 3350 (finding no case successfully enjoining NMB elections).

52. *Feaster* also recognizes a third exception when the plaintiff's suit poses a public question of international complexion particularly high on the scale of our national interests. 410 F.2d at 1365. This exception does not here apply since the parties raise no international issues.

53. *See Feaster,* 410 F.2d at 1366.

tion.[54] But the First Amendment does not guarantee that persons will have the funds to speak as they wish. Thus Continental's lacking the resources to launch the kind of anti-union campaign it desires does not transform the NMB's decision to hold a union election into a violation of Continental's freedom of speech.

### Due process

Continental basically contends that the Board's refusal to hold a hearing to discuss crafts and classes *after* bankruptcy violates Continental's due process rights. The Supreme Court and Fifth Circuit, however, have soundly rejected similar arguments.

▪ The employer in *Feaster* alleged that the NMB's failure to grant a hearing concerning the employer's "carrier" status amounted to a denial of due process sufficient to invoke this first exception to the ripeness doctrine. 410 F.2d at 1366. Relying heavily upon Supreme Court pronouncements in *Railway Clerks*, the Fifth Circuit rejoined that the Board's duty to investigate representation related issues is not adjudicatory, and thus its investigations need not employ the full panoply of judicial procedures. *Id.* Being essentially informal, NMB investigations need not even take any particular form. *Id.* Indeed, the Board does not have to conduct a hearing at *any* stage of the certification process. *Id.* The *Feaster* court therefore rejected the employer's due process claims.

United Airlines had launched a similar due process attack upon the NMB's craft/class investigation in *Railway Clerks*. 380 U.S. at 660, 85 S.Ct. at 1197. The Court first noted United's participation in a multiparty craft/class hearing almost 20 years earlier that had designated the same crafts and classes United presently contested. *Id.* at 662–65, 85 S.Ct. at 1198–00. The Court then observed that the Board had received and considered statements from United before making the craft/class determination at issue. *Id.* at 666, 85 S.Ct. at 1200. Finally, the Court stated that United was not a necessary party to any NMB proceeding, and that the extent of carriers' involvement in craft/class investigations is left solely to the Boards' discretion. *Id.* at 666–67, 85 S.Ct. at 1200–1201. The Supreme Court therefore rejected United's due process objections. *Id.* at 668, 85 S.Ct. at 1201.

▪ In this proceeding, the Board allowed Continental to participate in the nine days of hearings thus far held concerning Continental's post-merger operations; and it has continually received statements, challenges, and appeals from Continental concerning the appropriate craft/class designation.[55] Since the Board has here provided Continental no less due process than that sanctioned in *Feaster* and *Railway Clerks*, this Court must conclude that the "constitutional violations" exception offers Continental's Complaint no refuge from dismissal for want of ripeness.

### 2. Statutory violation exception

This second exception[56] excuses adherence to the ripeness doctrine in those "very narrow situation[s] in which there is a plain violation of an unambiguous and mandatory provision of the statute." *Feaster*, 410 F.2d at 1365. Continental seeks this exception's shelter by arguing that the Board has blatantly violated its statutory duty to sufficiently investigate the crafts and

---

**54.** Continental also mentions its employees' right to hear both sides of the unionization issue. But since *Feaster's* language expressly limits this exception to violations of the *complaining party's* constitutional rights, the employees' free speech interests are irrelevant.

**55.** *See supra* text at pp. 348–49.

**56.** The *Local 732* court maintained that this statutory inquiry is not technically an *exception*

to the ripeness doctrine, "but rather a narrow authorization to set aside Board orders made in excess of its delegated powers and contrary to a specific prohibition of the [RLA]". *IBT Local 732 v. NMB*, 438 F.Supp. 1357, 1363 (S.D.N.Y. 1977). Be that as it may, this Court foregoes that distinction of questionable difference and employs the terminology of *Feaster:* i.e., "exception". 410 F.2d at 1366.

classes appropriate for potential IBT certification.

Were this Court writing on a clean slate, it would doubt that Continental could even invoke this exception.[57] But this Court does not enjoy the freedom of a clean slate. The Fifth Circuit's reliance upon *Railway Clerks* in defining the limits of this second exception[58] necessarily means that *Railway Clerks* properly applied the second exception. And *Railway Clerks* involved a carrier contesting the statutory sufficiency of an NMB craft/class investigation. This Court must therefore allow Continental to urge this final exception to the ripeness doctrine.

### Focusing the inquiry

■■■ The Board has great discretion to designate appropriate crafts or classes by regrouping, amalgamating, or splintering

historic bargaining groups—and that designation is unreviewable. *UNA Chapter, Flight Engineers' Int'l. Assn. v. NMB,* 294 F.2d 905, 908 (D.C.Cir.1961); *cert. denied* 368 U.S. 956, 82 S.Ct. 394, 7 L.Ed.2d 388 (1962) ("*UNA* "); *see also Switchmen's Union,* 320 U.S. at 298–00, 64 S.Ct. at 96–97; *Feaster,* 410 F.2d at 1362 n. 8. Thus Continental's arguments stressing the alleged post-bankruptcy *incorrectness* of the Board's August 11th craft/class designation are irrelevant.

The proper inquiry focuses upon the statutory sufficiency of the NMB's investigation here. That inquiry, however,

> represents only a narrow and rarely successfully invoked exception to the [ripeness] doctrine.... Under this exception access to the courts is accorded only if the Mediation Board's determination is infused with error which is of a *summa*

---

57. This Court questions the propriety of this exception's application here on two grounds:

First, the provision governing the statutory sufficiency of the Board's investigation seems far from "unambiguous". As the discussion elsewhere in this opinion explains, NMB investigations are "informal" and "need not take any particular form." *Supra* text at p. 351, *infra* text at p. 371. Indeed, the Supreme Court vaguely defines the Board's statutory duty to investigate as "a duty to make such investigation as the nature of the case requires." *Railway Clerks,* 380 U.S. at 662, 85 S.Ct. at 1198 (citations omitted.) This Court therefore sees no "unambiguous" statutory provision to be violated.

Second, the *Feaster* court based this exception upon *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). *See Feaster,* 410 F.2d at 1366. In developing this exception, the Fifth Circuit explained that *Leedom* involved the National Labor Relations Board's grouping nonprofessional and professional employees together in one bargaining unit without the professionals' prior approval—a "brazen defiance of the expressed provisions of 29 U.S.C.A. § 159(b)(1)." *Feaster,* 410 F.2d at 1366. Section 159(b)(1) provides that

> [The NLRB] shall not ... decide that any unit is appropriate ... if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit.

The *Feaster* court then noted *Leedom's* reasoning that

> absence of jurisdiction of the federal courts' would mean a sacrifice or obliteration of a

right which Congress has given professional employees, for there is no other means, within their control ... to protect and enforce that right....

> This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers....

> Where, as here, Congress has a given a "right" to the professional employees it must be held that it intended that right to be enforced, and the courts * * * encounter no difficulty in fulfilling its purpose.

*Feaster,* 410 F.2d at 1367. That reasoning strongly suggests that only persons whose statutory rights are being violated can invoke this second exception.

The statute governing the NMB's investigation, 45 U.S.C. § 152 Ninth, is designed to protect the employees' right to freely choose a bargaining representative without any carrier influence or interference. *Supra* text at pp. 350–351. Carriers such as Continental, however, have no pre-certification rights under § 152 Ninth. Indeed the extent, if any, to which Continental can participate in the craft/class investigation lies within the Board's sole discretion. *Railway Clerks,* 380 U.S. at 666–67, 85 S.Ct. at 1200–01; *see generally supra* text at pp. 350–351 (on Continental's lack of a legitimate interest in these NMB proceedings). Since this Court therefore sees no statutory "right" given to Continental by Congress which needs to be enforced, the *Leedom* reasoning behind this second exception indicates that Continental should not be allowed to invoke the exception's shelter.

58. *Feaster,* 410 F.2d at 1367–68.

or *magna* quality as contraposed to decisions which are simply *cum* error. Only the egregious error melds the Board's decision into justiciability. Lesser maligancies thwart the jurisdiction of the courts.

*Feaster*, 410 F.2d at 1368. This Court's task is thus to "determine whether there was such an obvious or gross misapplication of statutory dictates that jurisdiction [is] vested in the district court." *Id.* The Fifth Circuit has accordingly explained:

> The [RLA's] premium on speed of resolution [in representation disputes] ... may be fulfilled only if the courts are extremely chary of involving themselves. The narrow [second] exception ... inevitably eliminates any strict concept of lack of jurisdiction, since it permits a peek at the merits.... The retention of the doctrine negativing jurisdiction to consider the merits serves to confine the assertion of jurisdiction to cases where the error on the merits is as obvious on the face of the papers as the violation of specific statutory language, without extension to arguing in terms of policy and broad generalities as to what the Railway Labor Act should provide.... [T]he Board's action must be so plainly beyond the bounds of the Act, or so clearly in defiance of it, as to warrant the immediate intervention of an equity court.

*Feaster*, 410 F.2d at 1368 n. 13 (quoting *IBT v. Brotherhood of Rail., A. & S.S. Clerks*, 402 F.2d 196, 204–05 (D.C.Cir.) *cert. denied* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968); *accord, IAM*, 425 F.2d at 536; *Lamoille*, 539 F.Supp. at 244; *Air Florida*, 534 F.Supp. at 14; *Local 732*, 438 F.Supp. at 1363; *Air Line Employee Assn. v. NMB*, 107 L.R.R.M. 2428, 2431 (D.D.C. 1981) ("*ALE*"); *Phillipine Airlines v. NMB*, 430 F.Supp. 426, 428–29 (N.D.Calif. 1977).

The "peek" which this Court takes at the merits of Continental's Complaint must therefore focus upon three issues:

(1) whether the NMB's violative misconduct is obvious on the face of the papers before the court;

(2) whether that misconduct constitutes a *clear* and *plain* violation of the RLA; and

(3) whether that violation is eggregious enough to warrant immediate equitable intervention.

*First issue: Obviousness of a violation on papers' face—and thus the propriety of future discovery*

 Given the requirement that the Board's alleged violation be "obvious on the face of the papers" and the RLA's premium on speedy resolutions free from carrier interference, this Court simply cannot grant Continental's motion to further delay these NMB proceedings by compelling discovery.

In further support, this Court first notes that the material facts are not so much in dispute here as the inferences to be drawn from those facts and the law to be subsequently applied.[59] Second, since the Board has not yet finalized or completed its investigation,[60] discovery at this juncture would bear no significant prospect of uncovering dispositive facts concerning the investigation's sufficiency.[61] This Court need not allow such a pointless exercise. *ALE*, 107 LRRM at 2431–32. And third, even *if* discovery might somehow aid the resolution of this lawsuit, this Court cannot delay its decision to provide Continental discovery time. For example, in *Hawaiian Airlines v. NMB*, 107 LRRM 3322 (D.Hi.1979), *aff'd without op.* 659 F.2d 1088, *op. replaced* 109 LRRM 2936 (1981) *cert. denied* 456

---

**59.** *Cf. Air Florida*, 534 F.Supp. at 8 n. 4.

**60.** *Supra* text at pp. 365–66.

**61.** This Court recognizes the Catch-22 situation in which this places Continental. But the purposes underlying the ripeness doctrine demand that if this second exception is to allow plaintiffs an opportunity to interrupt every stage of non-final agency actions, plaintiffs must be able to establish the requisite eggregious violation without delaying the agency's proceedings with tactics such as discovery. Having chosen to bear that heavy burden, Continental cannot complain of its weight.

U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982), the carrier objected that genuine credibility issues as to certain NMB investigation steps precluded summary judgment in the Board's favor. Dismissing that objection the court rejoined that such factual disputes are "exactly the kind of quibble which the Supreme Court precluded the courts from entertaining when in *Switchmen's Union* it observed that there should be 'no dragging out of the controversy into other tribunals of law.'" *Id.* at 3324.

This Court must therefore deny Continental's motion to compel discovery, and must accordingly limit its peek at Continental's complaints to the papers presently before it.

*Second issue: clear & plain violation of the duty to investigate*

■■■ The Board maintains that its craft/class investigation thus far comports with its interpretation of its statutory duties under § 152 Ninth. Especially given the NMB's longstanding experience, that statutory judgment deserves this Court's deference. *Chicago Truck Drivers,* 670 F.2d at 669, 670. As the Seventh Circuit explained when addressing whether the NMB violated the RLA by asserting jurisdiction over the employees in question,

> [I]n determining whether the Commission's action was "contrary to law," the task for the [reviewing court is] not to interpret the statute as it thought best but rather the narrower inquiry into whether the Commission's construction was "sufficiently reasonable" to be accepted by the reviewing court. To satisfy this standard it is not necessary for a

court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.

*Id.* at 670 (citations omitted) (quoting *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981)). Or as the D.C. Circuit explained when addressing whether the NMB violated the RLA's mandate to proffer arbitration when ongoing mediation was unsuccessful:

> It may well be that the likelihood of successful mediation is marginal.... [But the] court's inquiry cannot go beyond examination of the objective facts and determination thereon whether there is a reasonable possibility of conditions and circumstances ... available to the Board, consistent with the objective facts, sufficient to justify the Board's judgment that the possibility of settlement is strong enough to warrant continuation of the mediation process.

*IAM,* 425 F.2d at 541. Thus in assessing whether Continental shows a clear and plain violation of the RLA, this Court resolves doubts in favor of the NMB having properly exercised its statutory duties.[62] Continental's making merely a very persuasive showing of a violation will therefore not suffice.[63]

■■■ Continental's invocation of this second exception to the ripeness doctrine ultimately rests upon the charge that the Board has clearly violated its § 152 Ninth duty to investigate the craft/class appropriate for IBT certification. That duty is

---

**62.** *Cf. Zeviar v. Local 2747,* 733 F.2d 556, 559 (8th Cir.1984) (resolving all doubts in favor of NMB's proper exercise of authority in arbitration case); *Russell v. NMB,* 714 F.2d 1332, 1339 (5th Cir.1983) *cert. denied* ── U.S. ──, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) (court cannot substitute its own judgment as to what would be a preferable investigatory approach); *ALE,* 107 LRRM at 2431 (same).

**63.** *See also American General,* 496 F.2d at 200 (recognizing that whether the FTC had violated the statute was a "close question", yet none-

theless finding the second exception inapplicable since the agency's alleged error was not "blatant or obvious"); *Chicago Truck Drivers,* 670 F.2d at 667 (noting the persuasiveness of the plaintiff's arguments, yet nonetheless concluding that the NLRB had not clearly disregarded the RLA); *cf. Feaster,* 410 F.2d at 1369–71 (outlining the merit of plaintiff's argument that the NMB violated the RLA, yet nonetheless finding the second exception inapplicable since the Board's action was not a clear violation of the requisite degree).

no more than "a duty to make such investigation as the nature of the case requires." *Railway Clerks,* 380 U.S. at 662, 85 S.Ct. at 1198; *Air Florida,* 534 F.Supp. at 12. As the Supreme Court has explained,

> Congress has simply told the Board to investigate and has left to it the task of selecting the methods and procedures which it should employ in each case.

*Railway Clerks,* 380 U.S. at 662, 85 S.Ct. at 1199. The RLA contemplates informal action of no particular form. *Id.; Air Florida,* 534 F.Supp. at 12. It accordingly leaves all details and procedures concerning the duty to investigate to the Board's discretion. *E.g., Russell,* 714 F.2d at 1339; *British Airways,* 685 F.2d at 56; *Air Florida,* 534 F.Supp. at 15.

In assessing whether the NMB's conduct falls outside that very broad latitude, courts must consider the NMB's past airline craft/class determination experience. *Railway Clerks,* 380 U.S. at 665, 85 S.Ct. at 1200. This Court accordingly notes that the Board's trend has been to divide office, clerical, passenger service, and fleet service employees into separate subgroups for representational purposes. *Air Canada v. NMB,* 107 LRRM 2028, 2031 (S.D.N.Y. 1980), *aff'd. without op.* 659 F.2d 1057, *cert. denied* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981); *see also Air Canada,* 478 F.Supp. at 618. This Court similarly bears in mind the Board's prior TIA and Continental experience, for specific prior determinations of a given carrier's appropriate crafts/classes provide a guide to how much further investigation a later case requires. *Air Canada,* 107 LRRM at 2031.

*Railway Clerks* illustrates the resultant low standards of statutory sufficiency. The carrier in that case objected to the statutory sufficiency of the craft/class investigation charging primarily that the Board had overextensively relied upon the unions' craft/class suggestion and had denied the carrier's request for a hearing on the appropriate crafts/classes. 380 U.S. at

660–61, 85 S.Ct. at 1197–98. The Supreme Court noted the Board's longstanding craft/class experience in the airline industry, prior NMB determinations recognizing the craft/class designation in question, the involved unions' agreement as to that craft/class designation's appropriateness, and the Board's continued correspondence with the carrier. *Id.* at 662–66, 85 S.Ct. at 1198–1201. With those factors in mind, the Court concluded that the Board had "clearly complied with the statutory command that the Board 'investigate' the dispute." *Id.* at 666, 85 S.Ct. at 1201; *see also, Air Canada,* 107 LRRM at 2031. More recently, that low standard of statutory sufficiency has been satisfied by cursory investigations of one day [64] or even a few hours.[65]

▬ With that low statutory standard in mind, this Court briefly highlights the investigation relevant to this suit: The NMB's experience with investigating, determining, and testing the practicability of varied craft/class designations in the airline industry dates back to 1946. *Railway Clerks,* 380 U.S. at 662–65, 85 S.Ct. at 1198–00. It's experience with this particular airline's operations started at the latest in 1980 when the Board certified the IBT as the bargaining representative for certain TIA employees. When TIA merged with Continental in 1982, the Board began the present investigation pursuant to an IBT application to represent the combined TIA/Continental work force. The Board held nine days of hearings in April and June of 1983 investigating the appropriate craft/class designations. Both Continental and IBT participated in those hearings and submitted post-hearing briefs. On 11 August 1983 the Board issued a 22 page decision detailing its determination that the appropriate crafts/classes should be subgrouped into fleet service employees, passenger service employees, and clerical/office employees. Continental filed for bankruptcy under Chapter 11 on 24 September

---

**64.** *Long Island R.R. v. NMB,* 703 F.2d 680, 681 (2d Cir.1983).

**65.** *ALE,* 107 LRRM at 2431.

1983—drastically changing certain aspects of its operations such as size. The Board dismissed the IBT's application relative to the clerical/office employees for lack of interest in unionization, and ordered an election to further assess the passenger and fleet employees' desires. The Board rejected the IBT's request to change the proposed ballot form, and rejected Continental's request to delay the proposed balloting dates. The NMB allowed Continental to challenge the ballots, and on 10 January 1984 Continental appealed its challenges to the full Board. On that same date—January 10th—the Board stated that after the election but before any possible certification, it would consider Continental's claim that the intervening bankruptcy has rendered the prior craft/class designation inappropriate. This Court has already illustrated the many alternative paths that that post-election reconsideration might take.[66] The ballots have been mailed out and returned. Yet the stay order Continental secured has prevented the NMB from opening the ballots, ruling on Continental's challenges, or in any other manner proceeding with its investigation of this representation dispute.

In light of that history, the Board's broad statutory latitude, the NMB's past experience, and the deference due NMB decisions, this Court must conclude that Continental has failed to show a clear or plain violation of the NMB's duty to investigate.

### Third issue: need for immediate court intervention

■ Even if the Board did clearly violate the RLA, the second exception would exempt Continental's Complaint from the ripeness doctrine only if that violation is eggregious enough to warrant immediate equitable intervention.[67] That requires Continental to make "an extraordinary showing of necessity." *American General*, 496 F.2d at 200–01.

The equities here, however, favor the Board. Weighing heavily against judicial interference are the RLA's primary goal of speedily resolving employees' representation disputes free from carrier interference and the recognition that litigation delays hinder fair representation elections.[68] On the equitable scale's other arm, little counterbalances in favor of courts' intervening at a carrier's request since a carrier has few if any legitimate interests in pre-certification proceedings.[69] Thus, as previously noted, the damage of staying NMB representation proceedings is often greater than the damage of allowing the proceedings to go ahead.[70] Given that equitable imbalance, even the NMB's abusing its discretion has been held to not warrant judicial intervention at a carrier's behest. *Lemoille*, 539 F.Supp. at 244.

■ Given those equitable considerations, this Court concludes that any possible violation here by the NMB of its duty to investigate could not be egregious enough to warrant immediate equitable intervention. That conclusion confirms this Court's opinion that Continental's allegations fail to successfully invoke the second exception to the ripeness doctrine.

### Summary concerning second exception

With the above tripartite focus in mind, this Court must conclude that the second exception is inapplicable. The face of Continental's papers simply fail to show a clear or plain violation of the Board's duty to investigate of the requisite *magna* or *summa* degree to warrant this Court's immediate intercessation into the pre-certification proceedings. The "statutory violation" exception therefore offers Continental's Com-

**66.** *Supra* text at pp. 365–66.

**67.** *Id.* at pp. 369–70.

**68.** *See id.* at pp. 351, 358.

**69.** *See id.* at pp. 350–51.

**70.** *See id.* at p. 358.

**374**

plaint no sanctuary from dismissal for want of ripeness.

## VI. SUMMARY OF THIS OPINION

Through the course of this regretably long opinion, this Court has concluded that neither § 362 nor § 105 of Title 11 can justify the Bankruptcy Court's stay of these NMB representational proceedings. Having so decided that the stay must be lifted, this Court then withdrew the reference of Continental's underlying lawsuit for immediate resolution.

This Court rejected defendants' contention that Continental lacks standing. Addressing the defendants' motions to dismiss Continental's Complaint for lack of subject matter jurisdiction due to want of ripeness, this Court concluded that the Board's craft/class investigation is not yet ripe for judicial review. This Court then denied Continental's motion to compel discovery. Finally, Continental's attempts to invoke the "constitutional violation" and "statutory violation" exceptions to the ripeness doctrine failed. Thus Continental's Complaint must be dismissed for want of subject matter jurisdiction.[71]

Accordingly, this Court ORDERS, ADJUDGES, and DECREES that:

1. The 5 January 1984 Order of the Bankruptcy Court staying the NMB proceedings in this matter is REVERSED;

2. The defendants' motions to withdraw the reference of this lawsuit are GRANTED;

3. The plaintiffs' motion to compel discovery is DENIED; and

4. The defendants' motions to dismiss Continental's Complaint are GRANTED.

[71]. Prior sentiments of the Fifth Circuit are particularly applicable to the conclusion of this lawsuit:

> [W]e find the statutory command to attain a prompt and orderly settlement of labor disputes made a mockery in cynical disregard of the Supreme Court's hopeful but here frustrated words that there is "to be no dragging out of the controversy into other tribunals of law."

\*　\*　\*　\*　\*　\*

Having determined that this controversy is unripe for judicial intervention, we order that the jousting must terminate so that the electoral tournament may proceed. Let the epilogue to this epic be written.

*Feaster,* 410 F.2d at 1359, 1372 (footnote and citation omitted).